UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Matthew Cox,                                    Case No. 3:17-cv-02420

         Plaintiff

    v.                                          MEMORANDUM OPINION
                                        AND ORDER

Jodie Hausmann, et al.,

         Defendants.

## I.   Introduction

Before me is the motion for summary judgment filed by Defendants Perkins Local School District Board of Education (the Board), Jodie Hausmann, Andy Carroll, Michael Ahner, Brad Mitchel, Nicole Hykes, Jason Dulaney, and Dan Bowman.  (Doc. No. 45).  Plaintiff Matthew Cox filed a response in opposition, (Doc. No. 55), and Defendants replied.  (Doc. No. 60).

## II.   Background

Cox began a three-year contract with the Perkins Local School District on August 1, 2015, serving as the principal for Briar Middle School.  (Doc. No. 49 at 53-54).  Jodie Hausmann was the district's superintendent and Cox's supervisor during all times relevant to this suit.  Although Cox made it through his first year on the job without any significant incidents, he began having problems during the 2016-2017 school year and his relationship with his employer, and Hausmann in particular, worsened.  Cox resigned from his job in July 2017.

**A.    Cox's Email to Cafeteria Employee**

In September 2016, Cox sent an email to Hausmann and Linda Miller, a school employee responsible for supervising certain members of the cafeteria staff.  (Doc. No. 49 at 97-99).  In that email, Cox asked Hausmann, "Can we talk lunch supervision? Linda is making this incredibly difficult. She is micro managing and making my life much more difficult."  (*Id.* 49 at 275).  Following this, Hausmann met with Cox and informed him this was an inappropriate way to communicate with Miller and told him he should not do this again.  (*Id.* at 108).  Cox agreed the email was inappropriate and apologized to Miller.  (*Id.* at 105).

**B.    Choir Concert**

Another incident occurred in the fall of 2016, when Hausmann asked Cox if she would be able to speak to the audience before a choir concert at the school that evening.  (Doc. No. 49 at 160).  Cox, who claims he was concerned that Hausmann speaking might interrupt the concert schedule, responded by telling Hausmann she should ask the choir director whether she would be able to speak.  (*Id.* at 161-63).  Hausmann later testified that she felt Cox's response was inappropriate because she inferred from his response that he was making her ask a teacher for permission to speak, rather than taking it upon himself to inform the teacher that Hausmann would need to speak.  (*Id.* at 73-74, 76-78).

**C.    Field Trip to D.C.**

On January 12, 2017, Hausmann sent Cox an email asking which administrator would be attending the school's upcoming field trip to Washington, D.C.  (Doc. No. 49 at 287).  When Cox responded that a counselor Dave Zimmerman planned to attend, Hausmann replied that this was unacceptable and informed Cox that either he or Briar Middle School's Vice Principal, Jeff Thom, would have to attend.  Following this exchange, Cox sent an email to Hausmann as well as two other administrators, asking if they would be interested in attending the field trip because neither

2

himself nor Thom were able to go. (*Id.* at 288). Hausmann took this as Cox ignoring her directive that either Cox or Thom attend the trip and believed Cox's actions demonstrated a failure to communicate properly and a lack of understanding regarding the proper supervision of students on a field trip. (Doc. No. 45-4 at 1).

**D.      Bullying Incident**

Around the same time, Hausmann and Cox met regarding a complaint Hausmann received from a parent about a bullying incident that the parent believed Cox had not handled appropriately. Hausmann and Cox disagreed about the proper punishment for the incident, with Hausmann, according to Cox, believing a ten-day suspension was appropriate while Cox disagreed with imposing any out of school suspension at all. (Doc. No. 49 at 125, 135). Sometime around January 17, 2017, Cox informed Hausmann that his father had a serious illness, which might require Cox to take long-term leave on short notice sometime in the future. (Doc. No. 49 at 165-67). Cox did not request any leave under the Family and Medical Leave Act (FMLA) before his employment ended, but he contends that many of the acts that follow were retaliation for his expressing his intent to exercise his rights under the FMLA. (Doc. No. 55 at 25-26).

**E.      Pre-Disciplinary Meetings**

On January 25, 2017, Hausmann issued Cox a directive to attend a pre-disciplinary hearing on January 27, 2017. (Doc. No. 48 at 234). This directive was captioned "regarding the intention to non-renew and/or recommend to terminate." (*Id.*). It informed Cox he would have the opportunity to respond to allegations "regarding insubordination, not following board policy, and not respecting the chain of command." (*Id.*). It further stated: "These allegations, if substantiated, constitute good and just cause for non-renewal and up to termination of your administrative contract." (*Id.*).

On January 27, 2017, shortly before Cox was scheduled to meet with Hausmann, there was a fight in the cafeteria at Briar Middle School. (Doc. No. 49 at 178). Cox, who was just outside the cafeteria when the fight broke out, testified that he spoke with Briar Middle School's Vice Principal at the time, Jeff Thom, and the two agreed Thom would address the matter. (Doc. No. 55-4 at 3). Cox did not do anything to inform Hausmann of the fight himself, but he claims he told Thom to notify Hausmann through the school's inter-office mail system. (*Id.*).

Cox attended the January 27 meeting with his brother, Michael Cox, who was also his attorney at the time. (Doc. No. 55 at 22). The two met with Hausmann and the Board's attorney, DJ Young III. (Doc. No. 55-3 at 1). During the meeting, Hausmann brought up, among other things: the incident with the email to Linda Miller; Cox's handling of Hausmann's request to speak before a concert last fall; Cox's handling of the bullying incident earlier in the month; and Hausmann's and Cox's discussions concerning who would attend the Washington, D.C. field trip. Cox's attorney informed Hausmann and Young that because of the directive's failure to provide specific details about the allegations Cox would be facing, Cox was not prepared to respond to any of the allegations during the January 27 meeting itself. (Doc. No. 55 at 23). In response, according to Cox, Hausmann and Young agreed to "properly notice" the specific allegations that were raised during the January 27 meeting and address them at a later time. (*Id.*).

## F.    Administrative Leave

A few days later, on January 30, 2017, Cox was scheduled to attend a conference with Hausmann and a parent of the student responsible for the cyberbullying incident in January. The conference was cancelled when the parent did not show, but following this, Hausmann asked Cox to meet in her office. (Doc. No. 49 at 187). During this meeting, Hausmann told Cox she was upset that she learned of the January 27 food fight from someone other than Cox and cited this as another example of his failure to communicate. (*Id.*). She also placed Cox on a two-day paid administrative

leave.[1]  (*Id.*).  Cox claims that during this meeting, he asked to meet with the Board in executive session but Hausmann refused his request.  (Doc. No. 55-4 at 9).

After placing Cox on administrative leave, Hausmann asked a Perkins' police officer, who worked as a school resource officer, to escort Cox to the neighboring Briar Middle School so Cox could obtain his personal belongings from his office and then to drive Cox home.  (*Id.* at 188-92).  Cox alleges numerous staff members, students, and community members observed the uniformed police officer escorting him through the middle school before transporting him off the property in a police vehicle.  (Doc. No. 55-4 at 8).  The school resource officer also filed a police report concerning the incident.  (Doc. No. 49 at 296-97).

Cox and Hausmann met again on February 1, 2017.  Cox claims that it was during this meeting that Hausmann told him she had the Board's support not to renew his contract.  (Doc. No. 49 at 203-04).  Cox testified this statement made him believe he was being forced out of his employment, but he also admitted he did not know when Hausmann would have actually been able to recommend non-renewal.  (*Id.* at 233, 238).

Cox received a written reprimand on February 7, 2017, which informed him that his job performance required "improvement regarding communication practices and management of student discipline in order to ensure a safe learning environment for students and staff."  (Doc. No. 49 at 206-07, 301).  The reprimand went on to state, "Through the OPES [Ohio Principal Evaluation System] model, we will collaboratively set goals and identify action steps to assist you."

---

[1] The parties dispute the reasons Hausmann gave when placing Cox on administrative leave. According to Cox, Hausmann told him the leave included discipline for failing to communicate regarding the fight on January 27.  (Doc. No. 49 at 194-95).  In a letter Hausmann sent Cox later that day confirming that he was being placed on administrative leave, she explained that her decision was not based on Cox's failure to notify her of the January 27 fight, but that his failure to do so may lead to future discipline.  (Doc. No. 49 at 295).  Either way, whether Cox's failure to notify Hausmann of the January 27 fight played a role in her decision to place him on administrative leave does not impact the outcome of the dispute before me.

(*Id.* at 301).  No further discipline was imposed by the reprimand.  The letter concluded by informing Cox it would stay in his file until "the evaluation process demonstrates sufficient growth in the aforementioned areas."  (*Id.*).  No further discipline was imposed by the reprimand.

At the conclusion of his two-day administrative leave, Cox resumed working as the principal for Briar Middle School without any change in pay or benefits.  Although Cox testified that he began looking for other employment opportunities after the February 1 meeting, (Doc. No. 49 at 238), he was able to continue working at Briar for five months without any additional discipline or major workplace incidents.  Still, his relationship with Hausmann continued to deteriorate.

On February 2, the Sandusky Register published an article online concerning Cox.  In the article, the paper claimed residents had contacted the Sandusky Register and asked whether Cox had been fired.  (Doc. No. 49 at 299-300).  The article went on to state that while Cox had not been fired, he was involved in a pending personnel matter.  (*Id.*).  The article quoted Hausmann, who said of the pending matter, "[i]t was something I needed to address. I would not expect it to lead to termination of the principal. I don't anticipate board action with anything regarding this matter."  (*Id.*).

On February 5, Cox's attorney sent a letter to the Board's counsel claiming the school district had "serious legal exposure" as a result of its actions in dealing with Cox.  (Doc. No. 48 at 246-59).  The letter outlined various legal claims Cox believed he had as a result of the district's actions and made a list of demands.  This list included demands for all disciplinary action to be formally rescinded and Cox's personnel file to be expunged.  (*Id.* at 257).  Cox's counsel followed up with additional letters until the Board's counsel responded on February 23, disputing Cox's characterization of events and refusing to comply with the demands outlined in the February 5 letter.  The Board's counsel characterized the events leading to Cox's letter as "a very routine, low-level, disciplinary matter" and urged Cox to communicate directly with Hausmann rather than send

letters through his attorney to the Board.  (Doc. No. 55-3 at 19-20).  The letter also urged Cox to reconsider his position on the matter, stating: "To date, he has not lost any money, he has not been stripped of his job title, and he has not been fired."  (*Id.* at 20).

Then, in March 2017, Cox and Hausmann met to discuss Cox's 2016-2017 OPES evaluation.  Cox contends Hausmann included a false statement in his 2016-2017 evaluation.  (Doc. No. 49 at 218).  Specifically, Cox contested the portion of the evaluation that stated he: "Demonstrates an inconsistent reaction to behavior incidents that break board policy and/or ORC [referring to Ohio Revised Code]."  (Doc. No. 49 at 308).  Cox understood this to mean his reactions violated either board policy, or the Ohio Revised Code, or both.  (*Id.* at 219).  Because Cox did not believe any of his reactions to behavior incidents violated either board policy or the Ohio Revised Code, he refused to sign the OPES evaluation.[2]  (*Id.*).  Cox emailed Hausmann after the meeting to express his desire that the two of them continue working together collaboratively and informed Hausmann that he had contacted the Ohio Association of Secondary School Administrators to request an attorney.  (Doc. No. 49 at 315).

Cox claims that on April 25, 2017, he made his second request to meet with the Board, but Hausmann refused his request.  (Doc. No. 55-4 at 10).  Finally, on July 6, 2017, Cox provided the Board with a "cease and desist" letter, which also included written notice that he would be terminating his employment contract upon formal approval of an offer he had received from a different public employer.  (Doc. No. 49 at 231).  After receiving formal approval, Cox sent another letter to the Board on July 20 confirming he was terminating his employment contract.

---

[2] Defendants argue Cox misunderstood the statement.  (Doc. No. 60 at 19).  According to Defendants, the statement merely referred to behavior incidents that "break board policy and/or ORC."  Thus, it is the behavior incidents themselves that violate board policy or Ohio law, not Cox's reactions to them.  And, according to this reading, Cox's reactions to these behavior incidents are merely inconsistent.  Neither party offers any clarification regarding whether this reading of the statement was discussed with Cox prior to his refusal to sign the evaluation.

Following his resignation, Cox brought this suit for violations of federal and Ohio law against the Board, Hausmann, Dan Bowman (treasurer for Perkins Local School District), DJ Young III, and the following members of the Board: Andy Carroll, Michael Ahner, Brad Mitchel, Nicole Hykes, and Jason Dulaney.[3] (Doc. No. 1). Cox sued each of the individual defendants in both their individual and official capacities. Although Cox originally included thirteen claims in his complaint, he has since withdrawn both his First Amendment and breach of contract claims. (Doc. No. 55 at 25, 39).

### III.   STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV.   DISCUSSION

Cox brings claims for: constructive discharge; violations of his procedural due process rights; FMLA retaliation; libel; slander; false-light invasion of privacy; publicity given to private life;

---

[3] Cox also brought claims against DJ Young III, counsel for the Board, but I have since dismissed those claims. (Doc. No. 33).

intentional infliction of emotional distress; and intentional interference with business relationship, contractual relationship, and employment relationship.[4]

## A.  Procedural Due Process

Cox brings procedural due process claims against all Defendants.  To establish a procedural[5] due process violation, Cox must demonstrate:

> (1) that [he] had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that [he] was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford [him] adequate procedural rights before depriving [him] of [his] protected interest.

*Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010).

"Whether a person has a 'property' interest is traditionally a question of state law." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)).  "For example, '[a] property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances.'" *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017) (quoting *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004)).

Cox relies on the following to show he was deprived of procedural due process: (1) his interest in continued employment with Perkins; (2) the pre-disciplinary conferences and subsequent discipline; and (3) Hausmann's denial of his request to meet with the Board.

### 1.  Cox's Interest in Continued Employment

Cox first relies on his property interest in continued employment.  But even if Cox's three-year formal employment contract, which was set to expire in August 2018, created a property interest in continued employment, Cox cannot base his procedural due process claim on this

---

[4] Because Cox does not assert each of his claims against all Defendants, I will specify which of the defendants each claim is brought against when analyzing the claim.

[5] In his response in opposition to summary judgment, Cox concedes he is not alleging a substantive due process violation.  (Doc. No. 55 at 21).

because Defendants did not deprive him of any interest.  Instead, Cox himself relinquished any interest he might have when he voluntarily resigned.

Cox disputes this by arguing he was constructively discharged.[6]  To determine whether an individual has been constructively discharged, the Sixth Circuit applies the same standard, regardless of the substantive area of law under which a plaintiff's claim is brought.  *See Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630-31 (6th Cir. 2018), (analyzing constructive discharge under FMLA and citing to cases examining constructive discharge in the context of Title VII, the ADA, the Rehabilitation Act, and the FMLA).  Under this standard, "A constructive discharge occurs when 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"[7]  *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008)) (further citation omitted).  "The doctrine does not protect employees who leave their job 'in apprehension that conditions may deteriorate later.'"  *Groening*, 884 F.3d at 630 (quoting *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002)).

Cox relies on the following to show he was mistreated in a way that would make a reasonable person feel compelled to resign: (1) the January 27 and January 30 meetings with Hausmann and the lack of meaningful notice of the allegations he would face leading up to each; (2) being placed on a two-day administrative leave; (3) Hausmann having a Perkins police officer escort

---

[6] In his Twelfth Cause of Action, Cox attempts to bring a claim for constructive discharge.  Neither Ohio nor federal law recognize constructive discharge as an independent claim.  *Starks v. New Par*, 181 F.3d 103 (Table), 1999 WL 357757, at *5 (6th Cir. May 11, 1999); *Lucarell v. Nationwide Mut. Ins. Co.*, 44 N.E.3d 319, 331-32 (Ohio Ct. App. 2015) (*rev'd on other grounds*, 97 N.E.3d 458 (Ohio 2018)).  Because "[c]onstructive discharge from employment is not itself a cause of action," *Starks*, 1999 WL 357757, at *5, Defendants are granted summary judgment of this "claim."

[7] Although this standard has at times been read to contain a subjective intent requirement, the Sixth Circuit recently recognized how Supreme Court precedent calls into question the validity of examining subjective intent in this analysis.  *Tchankpa*, 951 F.3d at 815-16.  Because Cox fails to show his working conditions were "objectively intolerable," *see Groening*, 884 F.3d at 630, I need not address whether Cox satisfies any subjective intent requirement.

Cox to and from the middle school to gather his belongings after he was placed on leave; (4) the subsequent harm to Cox's reputation; (5) Hausmann stating on February 1, 2017, that she had the Board's support to not renew Cox's contract; (6) his 2016-2017 OPES evaluation; and (7) the Board refusing his requests to meet.  (Doc. No. 55 at 22-25, 36-37).  Even considered in combination, these conditions do not rise to the level required to show constructive discharge.

The January 27 meeting was not used to impose any actual discipline on Cox, therefore, whether Cox had notice of the allegations or not prior to that meeting is irrelevant.  And Cox admits that Hausmann and Young III agreed to "properly notice" the allegations against him at the conclusion of the January 27 meeting, so that he would receive appropriate notice prior to the January 30 meeting.  (Doc. No. 55 at 23).  As for the January 30 meeting, while Hausmann did place Cox on a two-day paid administrative leave at the conclusion of the meeting, the disciplinary notice Hausmann sent Cox later that day clearly informed him he was being placed on administrative leave pending further investigation.  (Doc. No. 49 at 295).  Because an employee's placement on administrative leave pending the outcome of an investigation into the employee's actions does not qualify as the kind of action severe enough for a reasonable employee to feel compelled to resign, Cox's placement on leave does not give rise to a constructive discharge.  *See, e.g.*, *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) (holding placement on paid administrative leave pending the outcome of an investigation does not even constitute an adverse employment action, let alone an "unbearable" condition compelling one to resign).

Cox's 2016-2017 OPES evaluation also does little to establish he was constructively discharged.  Cox claims that the OPES evaluation falsely stated that Cox's reactions to certain events violated board policy or Ohio law.  But even if his interpretation of the negative statement on the evaluation is correct, "this circuit has repeatedly held that an employer's criticism of an employee

does not amount to constructive discharge—especially when the employer's criticism is limited to a few isolated incidents[.]". *Groening*, 884 F.3d at 631.

The same is true of Cox's escort from Hausmann's office by the school's resource officer. Even if Cox and the officer were seen by students, teachers, or other community members, Cox has not shown how any harm to his reputation from this event affected the conditions at his workplace. Cox returned to work just two days later with no identifiable consequences. For the same reason, his allegations concerning the February 2 Sandusky Register article are similarly unavailing. Cox provides no evidence from which a reasonable jury could find there was the kind of harm to Cox's reputation that would make a reasonable person in his position feel compelled to resign.

Even if Hausmann told Cox she did not plan on recommending his renewal to the Board, this statement did not threaten Cox's ability to continue working under his contract for another year and a half. There is no evidence that Hausmann spoke with the Board about whether Cox's contract should be renewed or took any other actions to make Cox's working conditions unbearable during the time remaining on his contract. Finally, Cox did not have any property interest in employment beyond the three-year term of his contract, so any harm to prospects for renewal would be irrelevant to his procedural due process claim.

In sum, no reasonable jury could find that the conditions at Cox's employment were such that a reasonable person would have felt compelled to leave. Even after the written discipline, Cox performed the same job at the same pay and with the same benefits. Although his relationship with Hausmann deteriorated throughout the 2016-2017 school year, Cox fails to present evidence that his working conditions were so objectively intolerable that he was constructively discharged.

Because Cox cannot rely on a theory of constructive discharge, he cannot claim that he was deprived of his interest in continued employment for three years under the contract. Therefore, his procedural due process claim must rely on some other constitutionally-protected interest.

### 2.  Pre-disciplinary conferences and subsequent discipline

Cox argues that Defendants violated his due process rights through a series of events, beginning with the pre-disciplinary notice that led to the January 27 meeting and culminating in Cox being placed on administrative leave and being given a written reprimand.  (Doc. No. 55 at 21-25).  But while Cox attacks the process that was used throughout these events, he fails to identify any substantive, constitutionally-protected interest of which he was deprived.

For example, Cox has no constitutionally-protected interest in not being subject to pre-disciplinary conferences.  He identifies nothing in either Ohio law or his contract that guarantees him the right to be free from such conferences.[8]  Similarly, being placed on a two-day, paid administrative leave, does not implicate any constitutionally-protected interest for procedural due process purposes.  *See Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004); *Jackson v. City of Columbus*, 194 F.3d 737, 749 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  Cox does not identify any Ohio law, or provision of his employment contract, that grants him any property interest in being free from receiving a written reprimand of his job performance.  Nor does he point to anything that entitles him to receive Hausmann's help in his search for a new job.

### 3.  Cox's requests to meet with the Board

Finally, Cox argues he was deprived of a right when Hausmann denied his requests to meet with the Board to inform them of his belief that Hausmann was retaliating against him and aiming to deprive him of his due process rights.  (Doc. No. 55 at 19).  If Cox did have a right to meet with the

---

[8] Nor does Cox have any freestanding interest in being informed of the allegations against him before a conference occurs.  If Cox was deprived of some constitutionally-protected interest as a result of these conferences, things might be different.  If that was the case, the adequacy of the notice given prior to the conference, as well as what occurred during the conference, would be relevant in assessing whether Cox was given notice and a meaningful opportunity to be heard. *See Loudermill*, 470 U.S. at 542 (explaining it is an essential principle of due process that any deprivation of life, liberty, or property, be preceded by notice and an opportunity to be heard).

Board, the question would be whether such a right constitutes a property interest for due process purposes.  But I do not reach that question here because Cox fails to provide any evidence that such a right exists.

Cox does not cite to any Ohio law that grants him the right to meet with the Board at that point in time.  Cox does identify two Board Policies, but those policies do not apply to situations like Cox's.  (Doc. No. 55 at 19; Doc. No. 60-4 at 3-4).

Although Board Policy KL, entitled "Public Complaints," provides that "no member of the community" shall be denied the right to bring complaints to the Board, and Cox was, in a literal sense, a member of the community, the policy, when read in its entirety, clearly contemplates only those complaints from members of the community who do not already work for the District.[9] (Doc. No. 60-4 at 3).  Similarly, while Board Policy KLD, entitled "Public Complaints About District Personnel," provides District employees who are the subject of *public* complaints the opportunity, "[i]f it appears necessary," to meet with the Board to present their side, Cox sought to meet with the Board to discuss the problems he was having with Hausmann, rather than any public complaint that had been filed with the Board.  (*Id.* at 4).

Because Cox fails to identify any constitutionally-protected interest that he was deprived of, all Defendants are entitled to summary judgment on his procedural due process claims.

---

[9] For example, the policy provides for a review process that channels complaints first to lower-level district employees, and then to a school principal, followed by the district superintendent, before any review by the Board.  (Doc. No. 60-4. at 3).  Channeling complaints to lower-level employees first would make little sense if the policy applied to complaints brought by District personnel.  The policy also speaks of complaints "involving instruction, discipline, or learning materials," but read in the proper context, the word discipline here refers to discipline of students by District personnel, not discipline of District personnel.  (*Id.*).

**B.  FMLA Retaliation**

Cox brings his FMLA retaliation claims against all Defendants.  Because his claims against the individual defendants are barred by Sixth Circuit precedent, I will briefly discuss  those first.

The Sixth Circuit has held that the FMLA precludes individual liability claims against employees of a public agency.  *Mitchell v. Chapman*, 343 F.3d 811, 825-33 (6th Cir. 2003).  In *Mitchell*, the court focused on the text and structure of the FMLA and concluded that 29 U.S.C. § 2611(4)(A)(ii)(I), which it termed the "individual liability provision," did not apply to supervisory employees working at a public agency.  *Id.*  Although there is disagreement among the Courts of Appeals on this question, *see Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 413-17 (3d. Cir. 2012), I am bound by the Sixth Circuit's precedent, which dictates dismissal of Cox's claims against Hausmann and the individual members of the Board in their individual capacity because they are employees of a public agency.[10]

Thus, Cox is left with only his FMLA claim against the Board.[11]  To establish his *prima facie* case of FMLA retaliation, Cox must show that:

> (1) [he] was engaged in an activity protected by the FMLA; (2) the employer knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

---

[10]  Although *Mitchell* dealt with claims against supervisory employees of a federal public agency, the FMLA definition of "public agency" includes the "political subdivision of a State."  29 U.S.C. § 203(x); 29 U.S.C. § 2611(4)(A)(iii).  Further, Cox's argument that federal law allows for individuals to be sued in both their official and individual capacities, (Doc. No. 55 at 25), is irrelevant.  While *Mitchell* only discussed such claims against defendants in their individual capacity, this was because the claims against those defendants in their official capacity had already been resolved in an earlier stage of the litigation.  *Mitchell*, 343 F.3d at 822.  To the extent Cox brings these claims against the individual defendants in their official capacity, they are claims against the agency itself, and can be analyzed with his claim against the Board.

[11] Again, while Cox might theoretically assert an FMLA retaliation claim against the individuals in their official capacity, those claims would simply be claims against the Board itself.  They would be duplicative of the claim he already brings against the Board and therefore would fail for the same reasons his claim against the Board does.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

In order for Cox to show he was engaged in an activity protected by the FMLA, he must show he invoked his rights under the FMLA, which, in turn, requires a showing that Cox provided sufficient notice to his employer.  *Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 557 (6th Cir. 2010) (holding that to avail oneself of a right under the FMLA the employee must provide sufficient notice to their employer that they were suffering from an FMLA-qualifying condition).  In *Gipson*, where the employee only made general comments about feeling unwell at work, the court held those comments were insufficient because they did not provide the employer a basis to reasonably conclude that the employee was suffering from the kind of "serious health condition" covered by the statute.  *Gipson*, 387 F. App'x at 557.

Here, Cox must show he provided Defendants with enough information for them to reasonably conclude that he was planning to take leave to care for a parent with a "serious health condition."  *See* 29 U.S.C. § 2612(a)(1)(C); *see also* 29 U.S.C. § 2611(11) ("The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.").

The only evidence Cox presents here is his testimony that he told Hausmann he may need to take long-term leave on short notice because his father was suffering from a serious illness.  Cox did not explain what he meant by long-term leave, approximately when that leave might be necessary, or what kind of illness his father was suffering from.  Although Cox was not required to expressly invoke the FMLA, he was required to provide more information from which his employer could reasonably conclude the illness Cox was referring to would have been covered by the FMLA. *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2004) (holding employee did not sufficiently invoke rights under the FMLA where he informed supervisor of knee injury and indicated that he

16

planned to have knee looked at by medical department, but did not indicate that he would need time off, did not request any FMLA certification forms, and never requested leave in any follow up conversations with supervisor). Cox's comment to Hausman regarding his father's "serious illness" is no more specific than the vague comments that fell short as a matter of law in *Gipson*. *See Gipson*, 387 F. App'x at 555-56.

Because Cox's FMLA retaliation claims against the individual Defendants are foreclosed by the Sixth Circuit's holding in *Mitchell*, Hausmann, Carroll, Ahner, Mitchel, Hykes, Dulaney, and Bowman are entitled to summary judgment on Cox's FMLA retaliation claims against them in their individual capacity. Because no reasonable jury could conclude that Cox was engaged in activity protected by the FMLA when he told Hausmann that he may need to take leave at some unidentified point in the future, the Board is entitled to summary judgment on Cox's FMLA retaliation claim.[12]

## C. Defamation Claims

Cox brings defamation claims, in the form of both libel and slander claims, against Hausmann and the Board. To establish a claim for defamation, whether libel or slander, under Ohio law, a plaintiff must show:

> (1) that a false statement was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

*Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012) (quoting *Pollock v. Rashid*, 690 N.E.2d 903, 908 (Ohio Ct. App. 1996)). "Failure to establish any one of these elements is fatal to the claim." *Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015).

---

[12] Because Cox's claims against the individual defendants in their official capacity are claims against the agency itself, and therefore duplicative of his claims against the Board, the individual defendants are also entitled to summary judgment on Cox's FMLA retaliation claims against them in their official capacity for the same reason.

Cox claims the following contained defamatory statements: (1) the police incident report, (2) the written notices for the pre-disciplinary meetings, (3) the Sandusky Register article, and (4) Cox's 2016-2017 OPES evaluation.

### 1.  Police Incident Report

The police incident report does not contain any statements by Hausmann or the Board.  But even if Cox could link the report to these defendants, Cox provides no evidence that any of the statements in the report are false statements of fact. The narrative section of the report states:

> I was at the Perkins Board Office and was asked by Mrs. Hausman to come into an office.  Mrs. Hausman asked me to escort an employee off the property.  Mrs. Hausman stated they could retrieve their personal belongings and then needed to leave the property.  I then went and stood by until the employee got all of the belongings and left the property.

(Doc. No. 55-4 at 17).  Thus, the only statement of fact the report makes that concerns Cox is the statement that, while an officer stood by, Cox got all of his belongings and left the property.  Cox provides no evidence to show this statement is false.

### 2.  Written Notices for Pre-Disciplinary Meetings

The pre-disciplinary notices cannot serve as the basis of any defamation claim because there is no evidence that notices were published.  "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." *Hecht v. Levin*, 613 N.E.2d 585, 587 (Ohio 1993) (further quotation omitted).  The notices were sent to Cox directly, who presents no evidence from which a reasonable jury could conclude that the notices were communicated to anyone else.  Therefore, any statement conveyed in these notices does not give rise to a claim of libel.

### 3.  Sandusky Register Article

While the Sandusky Register article does include many statements concerning Cox, these statements are not false.  Cox does not dispute this but instead argues the statements are defamatory

18

because they "gave anyone who read the article the impression that Cox had, in fact, committed misconduct—albeit misconduct that would not lead to termination." (Doc. No. 55 at 28).

"[I]t is for the court to decide, as a matter of law, whether certain statements alleged to be defamatory are actionable or not." *Am. Chem. Soc.*, 978 N.E.2d at 853 (further citation omitted). "A statement is not a 'false statement' if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it. Moreover, a statement that is subject to different interpretations is not 'false.'" *Anthony List*, 779 F.3d at 633 (quoting *Serv. Emp. Int'l. Union Dist. 1199 v. Ohio Elections Comm'n*, 822 N.E.2d 424, 430 (Ohio Ct. App. 2004)) (further citation omitted).

The statements in question include assertions that Cox: (1) is involved in a pending personnel matter; (2) had not been fired; (3) was escorted from the building by a police officer earlier in the week; and (4) was still serving as the principal at Briar Middle School. Each of the statements in the Sandusky Register article has at least some truth to it: Cox was involved in a pending personnel matter at the time of the article; Cox had not been fired; Cox had been escorted from the building by a police officer earlier in the week; and Cox was still serving as the principal at Briar Middle School at the time the article was published. Although the article may be subject to different interpretations—for example, one reader might interpret it as implying that Cox had committed misconduct, while another might interpret them as saying only that Cox was being investigated for misconduct—it does not contain "false statements" for the purposes of a defamation claim.

#### 4.  Cox's 2016-2017 OPES Evaluation

Cox attacks as false the portion of the evaluation that states that he "[d]emonstrates an inconsistent reaction to behavior incidents that break board policy and/or ORC [Ohio Revised Code]."  (Doc. No. 49 at 308).  Whatever the true meaning may be, Cox's claim here fails because the statement can reasonably be interpreted to have an innocent meaning.

Under the innocent construction rule, "a statement reasonably susceptible to both a defamatory meaning and an innocent meaning must be construed, as a matter of law, to have an innocent meaning."  *Boulger v. Woods*, 917 F.3d 471, 483 (6th Cir. 2019) (further citation omitted).

Defendants offer a reasonable interpretation that renders the statement innocent.  They argue the statement, when understood correctly, simply says that Cox demonstrates an inconsistent reaction to certain incidents—incidents that themselves break "board policy and/or the ORC."  Because I find this reading reasonable, I must construe the statement as having an innocent meaning.

#### 5.  Conclusion

Because none of the alleged defamatory statements give rise to a claim of defamation, Cox fails to establish a *prima facie* claim.  Therefore, I need not address Defendants arguments regarding whether Cox's claims must overcome a qualified privilege.  Hausmann and the Board are entitled to summary judgment in their favor on Cox's libel and slander claims against them.

### D.  False Light

Cox brings a claim for the tort of false-light invasion of privacy against Hausmann and the Board.  The Supreme Court of Ohio first recognized this claim in *Welling v. Weinfeld*, stating:

> In Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

866 N.E.2d 1051, 1059 (Ohio 2007).

Cox argues Hausmann committed false-light invasion of privacy by having a police officer escort Cox through Briar Middle School to gather his belongings and then drive Cox home in a police cruiser, which, in turn, led to the school resource officer filing a police report and the Sandusky Register article concerning Cox.[13]  Hausmann argues that Cox fails to satisfy the publicity requirement.

"Publicity" in this sense "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  Restatement (Second) of Torts § 625D, cmt. a (1977); see also Restatement (Second) of Torts § 625E, cmt. a (1977) (incorporating the definition of publicity used in § 625D, cmt. a).

Cox has not presented any evidence that either his escort by the police officer or the police report were seen by enough people for a factfinder to conclude either of those matters were publicized.  Instead, Cox's argument to establish publication rests primarily on Hausmann's decision to ask an officer to escort Cox in the first place.  Essentially, Cox contends Hausmann having him escorted set off a chain of events which culminated in the story that was published in the Sandusky Register.  (Doc. No. 55 at 28-30).  In other words, according to Cox, Hausmann publicized the matter because but-for her decision to have Cox escorted, the matter would never have been communicated to the public at large.  But this argument fails because it is inconsistent with the mens rea required to establish liability for a false-light claim.

---

[13] The article stated Cox was involved in a "pending personnel matter" and reported that, according to a police report, Cox had been escorted from the middle school building by an officer.  (Doc. No. 48 at 241).  Cox claims this placed him in a false light by giving those who read the article the impression that he committed misconduct.  (Doc. No. 55 at 28-30).

Cox must show Hausmann "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter *and the false light in which the other would be placed.*"  *Welling*, 866 N.E.2d at 1059 (emphasis added).  Thus, it is not enough for Cox to show that the matter eventually was publicized. Instead, he must provide evidence that Hausmann acted with the requisite mental state when she took actions that ultimately "gave publicity to a matter concerning another[.]"  Cox fails to do so.

Cox provides no evidence that Hausmann was aware of, or recklessly disregarded any risk of, the fact that the officer escorting Cox would file a police report, or that this report would be referenced in the Sandusky Register article.  He cites Hausmann's opposition to the filing of a police report as evidence that Hausmann was aware of the risk that might come to Cox's reputation if a report was filed.  But even if Hausmann was aware of the potential harm that might come from a report, there is no evidence that she recklessly disregarded any risk that a report would be filed in the first place.  In fact, as soon as Hausmann began to see the unintended consequences of her decision to have Cox escorted by a school resource officer, she took steps to mitigate the potential harm that decision would cause, including asking the Chief of Police not to file the report.  (Doc. No. 47 at 83; Doc. No. 55-1 at 1).  Her opposition to the report being filed, and to any further publication of the events at issue, undermines any finding that she "had knowledge or acted in reckless disregard as to" the false light in which Cox would eventually be placed.

Because Cox cannot establish that Hausmann acted with the requisite mental state, Hausmann is entitled to summary judgment on Cox's false-light claim.  Because Cox does not allege any facts connecting the Board to this claim, the Board is also entitled to summary judgment on Cox's false-light claim.

### E.  Publicity Given to Private Life

Cox brings a tort claim for publicity given to private life against Hausmann.  To establish his claim for publicity given to private life, Cox must show:

> (1) there is publicity; (2) the facts disclosed concern an individual's private life; (3) the matter publicized was one that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) the publication was made intentionally, rather than negligently; and (5) the matter publicized was of no legitimate concern to the public

*Miller v. Davis*, 653 F. App'x 448, 459 (6th Cir. 2016) (internal quotations omitted) (citing *Killilea v. Sears, Roebuck & Co.*, 499 N.E.2d 1291, 1294-95 (Ohio Ct. App. 1985)).  Cox argues Hausmann committed this tort on February 2, 2017, when she told those present at a levy meeting that Cox may not be working for the Board much longer because his father was seriously ill.

As was the case with Cox's false-light claim: "Publicity" in this sense "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  Restatement (Second) of Torts § 625D, cmt. a (1977).  In his deposition, Cox was only able to identify three individuals who were present at the levy meeting, (Doc. No. 49 at 230), but through an affidavit Cox later stated that he believes there were between five and ten people at the meeting.  (Doc. No. 55-4 at 11).  Taking Cox's affidavit statement as true, the group present at the levy meeting would be too small for Hausmann's statement to satisfy the publicity requirement.  *See, e.g., Williams v. OmniSource Corp.*, No. 3:14-cv-718, 2018 WL 340154, at *12 (N.D. Ohio Jan. 9, 2018) (finding no publicity where statement was included in police report); *Linetsky v. City of Solon*, No. 1:16-cv-52, 2016 WL 6893276, at *15 (N.D. Ohio Nov. 23, 2016) (finding no publication where defendant told school employees, her psychologists, law enforcement officers, prosecutors, and a couple friends about allegations concerning plaintiff).

Because Cox fails to meet the publicity requirement, Hausmann is entitled to summary judgment on Cox's claims for publicity given to private life.

## F. Intentional Infliction of Emotional Distress

Cox brings claims for intentional infliction of emotional distress against all Defendants. Under Ohio law, a plaintiff bringing an intentional infliction of emotional distress (IIED) claim must show:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Ondo v. City of Cleveland*, 795 F.3d 597, 611-12 (6th Cir. 2015) (citing *Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio Ct. App. 1995)) (further citation omitted). Because the second element is dispositive of Cox's IIED claims, I need only address that element.

"Whether conduct is 'extreme and outrageous' is initially a question of law for the court." *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 714 (Ohio Ct. App. 2009) (further citation omitted). Cox's burden of showing the conduct was sufficiently "extreme and outrageous" is not one easily met. That is,

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be

24

expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt.

*Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) Torts § 46 cmt. d (1965)), *abrogated on other grounds by Welling*, 866 N.E.2d 1051.

Although Cox brings this claim against all Defendants, his arguments focus entirely on Hausmann's conduct. Because he does not provide any evidence of extreme and outrageous behavior by any of the other defendants, those defendants are entitled to summary judgment on his intentional infliction of emotional distress claims.

Cox argues the following behavior by Hausmann was extreme and outrageous: ordering a police officer to escort Cox through Briar Middle School and then drive him home; banning Cox from school district property for two days while Cox was on administrative leave; disclosing information about Cox's father and his illness to members of the levy committee; and depriving Cox of his due process rights by denying him an opportunity to defend himself. (Doc. No. 55 at 31-32).

First, I have already found Cox was not deprived of any due process rights. To the extent Cox alleges he was not given an adequate opportunity to refute Hausmann's allegations of misconduct before he was disciplined, nothing about the Defendants investigation or discipline of Cox rises to the level required to consider their behavior outrageous. *See Branan v. Mac Tools*, No. 03AP-1096, 2004 WL 2361568, at *7 (Ohio Ct. App. 2004) ("A lawfully conducted investigation where wrongdoing is suspected, even if vigorously or oppressively undertaken, will not be characterized as extreme or outrageous.").

As for the remainder of Cox's allegations, even if Hausmann's motivations were improper and retaliatory, her actions do not rise to the level required to support an IIED claim. *See, e.g., Jones v. Wheelersburg Local Sch. Dist.*, No. 12CA3512, 2013 WL 4647645, at *7-10 (Ohio Ct. App. 2013) (no

extreme and outrageous conduct where plaintiff alleged board of education, superintendent, and treasurer: acted in ways designed to embarrass, humiliate, and degrade her and make her a scapegoat for their own misfeasance; badgered her for over four hours; denied her request for an attorney, telling her she did not need a lawyer if she was innocent; and, falsely accused plaintiff of theft); *Branan*, 2004 WL 2361568, at *7 (no extreme and outrageous conduct where employer: interrogated employee for hours, refusing employee's requests to leave; physically intimidated employee; told employee they would never get another job in the industry and would not be able to feed their child; searched employee's personal belongings; and observed employee's home, taking pictures of home and vehicles parked in front of it); *Shepard v. Griffin Servs., Inc.*, No. 19032, 2002 WL 940110, at *15-16 (Ohio Ct. App. 2002) (no extreme and outrageous conduct where plaintiff alleged that defendant: purposefully discriminated against her on the basis of sex; maliciously defamed her reputation by accusing her of fraud, falsification of records, and deception, without properly investigating the truth of those accusations; published private and confidential information about her; retaliated against her for complaints of discrimination; and terminated her employment based on false accusations and an incomplete investigation).

Because Cox cannot show that any of the Defendants engaged in conduct that was sufficiently extreme and outrageous, all Defendants are entitled to summary judgment on Cox's claims for intentional infliction of emotional distress.

## G.  Intentional Interference Claims

In his ninth, tenth, and eleventh causes of action, Cox brings claims for: intentional interference with a business relationship; intentional interference with a contractual relationship; and intentional interference with an employment relationship.  Cox brings each of these claims against Hausmann, Carroll, Mitchel, Ahner, Hykes, and Dulaney.  While these are distinct claims, they are closely related to one another, and each fails for similar reasons.

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A &-B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. &- Constr. Trades Council,*651 N.E.2d 1283, 1294 (Ohio 1995).  "Ohio recognizes the cause of action for tortious interference with a business relationship when the business relationship at issue is an employment relationship." *Tessmer v. Nat'l Life Ins. Co.*, No. 98AP-1278, 1999 WL 771013, at *6 (Ohio Ct. App. Sept. 30, 1999) (citing *Kenty v. Transam. Prem. Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)).

Although the torts of intentional interference with contract, intentional interference with a business relationship and intentional (or tortious) interference with an employment relationship are different in name, they are essentially the same.  All share common elements.  *See Fred Siegel Co. L.P.A. v. Arter &- Hadden*, 707 N.E.2d 853, 858 (Ohio 1999) (contractual relationship); *Lanzer v. Louisville*, 75 N.E.3d 752, 760 (Ohio Ct. App. 2016) (employment relationship); *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 2015) (quoting *Wolf v. McCullough-Hyde Mem'l Hosp.*, 586 N.E.2d 1204, 1208 (Ohio Ct. App. 1990) (business relationship).  But a plaintiff cannot recover under all three based on the same facts, as Cox appears to allege.

Here, Cox first asserts Hausmann and the individual Board members interfered with his contractual employment relationship between himself and the Board.  This is a claim of intentional (or tortious) interference with an employment relationship and I will analyze it as such.  Cox also argues Hausmann interfered with a prospective employment relationship by refusing to act as a reference.[14]  (Doc. No. 55 at 35).  This is a claim of intentional interference with a business

---

[14] Cox does not include this allegation in his complaint.  This alone is sufficient to deny Cox relief here.  *See Tucker v. Union of Needletrades, Indus. &- Textile Emp.'s*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.") (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)).  However, because

relationship as no contract is alleged to exist. *See Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 774 N.E.2d 775, 780-81 (Ohio Ct. App. 2002) ("The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract.").

### 1. Employment Relationship

To recover on a claim for intentional interference with an employment relationship, Cox must show:

> 1) the existence of an employment relationship between plaintiff and the employer; 2) the defendant was aware of this relationship; 3) the defendant intentionally interfered with this relationship; and 4) the plaintiff was injured as a proximate result of the defendant's acts

*Lanzer*, 75 N.E.3d at 760. Cox cannot establish the fourth element here because he was the one who procured the breach of his employment contract when he chose to leave his job and seek employment elsewhere before the term of his contract expired. And Cox's arguments concerning the ways in which Hausmann and the individual Board members conspired to force him to resign are foreclosed by my finding that no reasonable jury could conclude that Cox was constructively discharged. Because any damages Cox suffered were brought about by his voluntary decision to resign from his employment, Hausmann, Carroll, Mitchel, Ahner, Hykes and Dulaney are entitled to summary judgment on Cox's claims for intentional interference with an employment relationship.

### 2. Business Relationship

To establish a claim for intentional interference with a business relationship, Cox must show:

> (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.

---

Defendants did not contest Cox's claim on these grounds, I will analyze this theory of liability below.

*Ginn*, 30 N.E.3d at 1034, 1039 (Ohio Ct. App. 2015).

Cox argues that Defendants interfered with prospective business relationships he had with potential employers.  (Doc. No. 55 at 35).  But Cox fails to identify any particular prospective business relationship he missed out on as a result of Hausmann's refusal.  *See Marinelli v. Prete*, No. E-09-022, 2010 WL 2025374, at *6 (Ohio Ct. App. 2010) (affirming summary judgment for defendant where plaintiff never identified who she would have had business relationship with). Because Cox cannot establish the first element of his claim for intentional interference with a business relationship, Hausmann, Carroll, Mitchel, Ahner, Hykes, and Dulaney are entitled to summary judgment on Cox's claim for intentional interference with a business relationship.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.  (Doc. No. 45).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge